**INSURANCE CONSULTANTS OF AMERICA, INC., EMPLOYEE PENSION PLAN; Albert and Flora Lechter; Bernard E. Koff; Murray and Carole Novick; Gary Schaedel; L. Arne Skilbred; Profit–Sharing Trust for Marprowear Corp.; Ira Coleman; John A. Roberts Co. Inc. Retirement Plan; Frank P. Farinella, Jr.; The Spitz Trust; Zarrow, Zarrow & Klien; Donald C. Works, Jr.; Kenneth M. Reichle, Jr.; Stateline Management Pension Fund; Malt Products Corporation; and J.W. Pierson Company Pension Plan, Plaintiffs**

v.

**SOUTHEASTERN INSURANCE GROUP, INC.; Robert A. Beck II; Ronald M. Prupis; Leonard Bellezza; Byron L. Sparber; William D. Lipkind; Neil L. Prupis; Stephen E. Lampf; Paul M. Petigrow; Ernest J. Sabato; William**

Paulus, Jr.; Harry Olstein; Frederick C. Mezey; Joseph S. Littenberg; Linda F. Burton; Lynn K. Day; Carl B. Shible; Deloitte Haskins & Sells; Lampf, Lipkind, Prupis & Petigrow; Richard Roe, Inc. and John Doe, Defendants.

Civ. A. No. 89–3389.

United States District Court,
D. New Jersey.

Aug. 21, 1990.

Theodore L. Abeles, Sills, Cummis, Zuckerman, Radin, Tischman, Epstein & Gross, Newark, N.J., for plaintiffs.

Michael M. Rosenbaum, Budd, Larner, Gross, Rosenbaum, Greenberg & Sade, Short Hills, N.J., for defendants Bellezza, Sabato, Olstein, Mezey and Paulus.

L. Bruce Puffer, Shanley & Fisher, Morristown, N.J., for defendant Deloitte Haskins & Sells.

Matthew P. Boylan, Mary Jo Reich, Lowenstein, Sandler, Kohl, Fisher & Boylan, Roseland, N.J., for defendant Lampf, Lipkind, Prupis & Petigrow.

Bradley S. Hartman, Litman, Muchnick, Wasserman & Hartman, Hollywood, Fla., for defendant Shible.

Jules Rossi, Long Branch, N.J., Jay Starkman, Steel, Hector & Davis, Miami, Fla., for defendant Beck.

Stephen E. Lampf, William D. Lipkind, Neil L. Prupis and Paul M. Petigrow, Lampf, Lipkind, Prupis & Petigrow, West Orange, N.J., pro se.

David M. Feinberg, Feinberg, Feinberg & Trisch, Rahway, N.J., for defendant Littenberg.

Byron L. Sparber, Squire, Sanders & Dempsey, Miami, Fla., pro se.

Ronald M. Prupis, Fisher Island, Fla., pro se.

Lynn K. Day, Coral Springs, Fla., pro se.

Linda F. Burton, Fort Lauderdale, Fla., pro se.

## OPINION

LECHNER, District Judge.

The plaintiffs in this action are a group of investors who invested and lost substantial sums of money in the private offering (the "Private Offering") of securities in a high-risk business venture called the Southeastern Insurance Group, Inc. ("SIG"). In an effort to recoup some or all of their investment, the plaintiffs initiated this lawsuit alleging violations of various federal and state securities laws, the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 *et seq.* ("RICO") as well as common law fraud, negligence and other claims against a large group of individuals involved in the Private Offering and the subsequent operation of SIG.

Presently before the court are the individual and consolidated motions of the defendants for summary judgment pursuant to Fed.R.Civ.P. 56 or to dismiss pursuant to Fed.R.Civ.P. 9(b) and 12(b)(6) as to the federal claims and to dismiss the state claims for lack of pendent jurisdiction.[1]

---

1. The numerous briefs of the parties on these motions are identified as follows: Defendant Lampf, Lipkind, Prupis & Petigrow's Brief in Support of Motion for Summary Judgment as to the First, Second and Third Counts and for Dismissal of the Fifth, Sixth, Seventh and Fourteenth Counts of the Complaint Against It ("LLPP Brief"); Defendant Deloitte Haskins & Sells' Memorandum of Law in Support of Motion to Dismiss the First, Second, Third, Fifth, Sixth, Seventh, and Sixteenth Counts of the Complaint Against It ("DHS Brief"); Memorandum of Law of Defendants Leonard Bellezza, Ernest J. Sabato, William Paulus, Jr., Harry Olstein and Frederick C. Mezey in Support of their Motion to Dismiss the First through Thirteenth Counts of the Complaint as Alleged Against Each of Them, Respectively ("Directors' Brief"); Motion to Dismiss with Attached Memorandum of Law filed on behalf of Carl B. Shible ("Shible Brief"); · Plaintiffs' Amended Memorandum of Law in Opposition to Various Defendants' Motions to Dismiss and/or for Summary Judgment ("Plaintiffs' Brief"); Defendant Lampf, Lipkind, Prupis & Petigrow's Reply Brief in Support of Motion for Summary Judgment as to the First, Second and Third Counts and for Dismissal of the Fifth, Sixth, Seventh and Fourteenth Counts of the Complaint Against It ("LLPP Reply"); Defendant Deloitte Haskins & Sells' Reply Memorandum of Law in Support of Motion to Dismiss the First, Second, Third, Fifth, Sixth, Seventh, and Sixteenth Counts of the Complaint Against It ("DHS Reply"); Reply Memorandum of Law of Defendants Leonard Bellezza, Ernest J. Sabato, William Paulus, Jr., Harry Olstein and Frederick C. Mezey in Support of their Motion to Dismiss the First through Thirteenth Counts of the Complaint as Alleged Against Each of Them, Respectively ("Directors' Reply"); Reply Letter–Brief, dated 7 June 1990, in support of defendants William D. Lipkind's and Neil L. Prupis' Amended Motion for Summary Judgment as to the Eighth Count and Dismissing the Ninth Count of the Amended Complaint Against Them ("Lipkind & Prupis Reply").

Oral argument on these motions was held on 3 August 1990. References to the transcript of oral argument are identified as "Tr. at _."

For the reasons which follow, summary judgment is granted as to the federal securities law claims on the ground that the plaintiffs failed to comply with the applicable statute of limitations. The direct RICO claim, which is predicated upon the same facts as the securities fraud claims, is dismissed because the plaintiffs have not alleged the existence of a pattern of racketeering activity with regard to the conduct of the defendants prior to the Private Offering. The state law claims pendent to those federal claims are dismissed for lack of pendent jurisdiction.

The motions to dismiss the derivative RICO claim and the state law claims pendent thereto are denied. However, the plaintiffs are directed to file an amended pleading setting forth the derivative RICO claim in a separate count pursuant to Fed. R.Civ.P. 10(b).

Facts

A. *The Parties*

The plaintiffs are alleged to be shareholders of SIG. The Class Action and Derivative Complaint and Demand for Jury Trial was filed on 10 August 1989, amended on 11 August 1989 to add substantive allegations and amended a second time on 26 June 1990 to add additional plaintiffs (the "Second Amended Complaint"). Plaintiffs Ira Coleman ("Coleman") and Insurance Consultants of America, Inc. Employee Pension Plan ("ICA") verified the Second Amended Complaint. Although the defendants claim certain plaintiffs did not

invest in SIG (LLPP Brief at 1 n. 2), there is no reason to believe Coleman and ICA did not invest in SIG. The Second Amended Complaint constitutes an affidavit.

■ Defendant SIG was an insurance holding company organized in 1982 under Florida law. At the time relevant to this action, SIG was engaged primarily in the surety insurance and reinsurance businesses [2] through subsidiaries which were incorporated in Florida or New Jersey. *Id.,* ¶¶ 28–34. At least three wholly-owned subsidiaries of SIG obtained certifications from federal or state authorities to act as surety insurers and reinsurers.[3]

At the time this action was commenced, most of the operating subsidiaries of SIG had been placed in rehabilitation or had their authorizations revoked. *Id.,* ¶ 60. On 5 January 1990, SIG filed a bankruptcy petition in the Southern District of Florida and a bankruptcy trustee was appointed on behalf of SIG. Directors' Brief at 25, Ex. C. On 7 June 1990, the trustee obtained permission from the bankruptcy court to retain plaintiffs' counsel to represent the estate of SIG in its derivative claims.[4]

Defendant Lampf, Lipkind, Prupis & Petigrow ("LLPP") is a law firm located in West Orange, New Jersey. The named partners of LLPP are defendants Stephen E. Lampf ("Lampf"), William D. Lipkind ("Lipkind"), Neil L. Prupis ("N. Prupis") and Paul M. Petigrow ("Petigrow") (collectively the "LLPP Defendants"). The LLPP

---

**2.** Surety insurance is a guaranty of the performance of an obligation to be completed by another, usually in the context of construction subcontracting. Second Amended Complaint, ¶ 46. Reinsurance is an agreement pursuant to which the reinsurer agrees to assume a portion of the risk existing on an underlying insurance contract issued by the reinsured. *Id.,* ¶ 47.

**3.** Southeastern Casualty and Indemnity Insurance Company, Inc., a Florida corporation ("SCI–FL") was authorized by the United States Treasury Department to act as a surety and surety reinsurer on debts and obligations running to the United States. Second Amended Complaint, ¶ 49. Southeastern Casualty and Indemnity Insurance Company of New Jersey, Inc., ("SCI–NJ") a New Jersey corporation, was authorized by the New Jersey State Insurance Commissioner to issue surety and reinsurance

in the state of New Jersey. *Id.,* ¶ 50. Southeastern Reinsurance Company ("SRC"), a Florida corporation, received similar authorizations from the United States Treasury Department and the State of Florida. *Id.,* ¶ 51.

SRC was incorporated at the time of the Private Offering and had no employees or financial record at that time. SRC obtained authorization to act as a reinsurer from the State of Florida in October 1986. *Id.* SCI–FL and SCI–NJ were preexisting, operational subsidiaries of SIG and had obtained authorizations prior to the Private Offering. None of the SIG subsidiaries are parties to this action.

**4.** *See* Letter, dated 15 June 1990, from Theodore L. Abeles, Esq., counsel for plaintiffs, to United States Magistrate Ronald J. Hedges and exhibits thereto.

Defendants are alleged to have actively solicited the plaintiffs to purchase shares of SIG securities in the Private Offering and to have acted as counsel to SIG in connection with the Private Offering.[5]

In addition to their affiliation with LLPP, Lipkind and N. Prupis were directors and executive officers of SIG and its subsidiaries. Lipkind acted as general counsel of SIG and SCI–NJ and was a member of SIG's steering committee. N. Prupis served as assistant secretary, executive vice president and general counsel of SIG and president of SCI–NJ. Second Amended Complaint, ¶¶ 16–17.

Defendant Ronald M. Prupis ("R. Prupis"), the brother of N. Prupis, was the chairman of the board of directors, chief executive officer and an executive vice president of SIG. Other directors and officers or controlling persons of SIG include defendants Robert A. Beck II ("Beck"), Leonard Bellezza ("Bellezza"), Byron L. Sparber ("Sparber"), Ernest J. Sabato ("Sabato"), William Paulus, Jr. ("Paulus"), Harry Olstein ("Olstein"), Frederick C. Mezey ("Mezey"), Carl B. Shible ("Shible") and Joseph S. Littenberg ("Littenberg"). Defendants Linda F. Burton, Lynn K. Day are alleged to be officers of SIG or its subsidiaries, but not directors. *Id.*, ¶¶ 12–15, 18–25.

Defendant Deloitte Haskins & Sells ("DHS") is a New York accounting firm which certified the consolidated financial statements of SIG and its subsidiaries at the time of the Private Offering.

## B. *The Private Offering*

The plaintiffs purchased SIG securities pursuant to a Private Placement Memorandum ("PPM"), dated 30 April 1986, and an Investment Questionnaire and Subscription Agreement (the "Subscription Agreement") executed by the individual plaintiffs in connection with their investments in SIG. Lipkind Cert., Exs. 1 & 2.

A subscription unit of SIG ("Unit") consisted of four hundred shares of ten-cent-par common stock at $187 per share and fifteen ten-year, subordinated, callable debentures in the principal amount of $10,000 bearing an interest rate of 12% per annum. The common stock of SIG was unregistered and there was no public market for the shares. The Private Offering consisted of 134 Units. Each Unit had a subscription price of $224,800. Certain investors were allowed to purchase fractional Units, with the permission of SIG.

The closing of the Private Offering occurred on 11 August 1986 (the "Closing Date") at which time the entire subscription of SIG securities was issued to qualified investors. The Private Offering aggregated in excess of $30,000,000. The proceeds of the Private Offering were used as follows: approximately $800,000 to legal, accounting, financial advisory, printing and other fees and expenses associated with the Private Offering, approximately $1,788,000 to principal and interest obligations on an existing promissory note of SIG, approximately $27,000,000 to the capital of SRC and approximately $535,000 as the working capital of SIG. Second Amended Complaint, ¶ 52; Lipkind Cert., ¶ 10.

LLPP acted as an advisor to SIG and its subsidiaries in connection with the Private Offering. Nearly all of the investors in the SIG Private Offering were clients of the LLPP firm. The LLPP Defendants are alleged to have participated in the drafting of the PPM and to have offered the Units of SIG to the individual plaintiffs pursuant to oral and written representations and the PPM.

## C. *The PPM and Subscription Agreement*

Prior to investing in SIG, each investor, including the plaintiffs, was required to complete and submit to SIG an executed

---

**5.** In addition to LLPP, other law firms advised SIG in connection with the Private Offering. These law firms were not involved in the management of SIG or its subsidiaries subsequent to the Private Offering and are not named as defendants in the Second Amended Complaint.

Subscription Agreement. The stated purpose of the Subscription Agreement was to assure that (1) an investment in the Units by the Investor is suitable in light of the Investor's personal and financial positions, (2) the Investor has such knowledge and experience in financial and business matters that such Investor is capable of evaluating the merits and risks of the investment and (3) each Investor will meet the standards imposed by state securities laws and Regulation D promulgated under the Securities Act of 1933, as amended ... since the Units will not be registered under federal or state securities laws.

Lipkind Cert., Ex. 2.

The Subscription Agreement required each potential investor in SIG to indicate that he considered himself to be an experienced and sophisticated investor, he had read the PPM, understood the risks involved and had an ability to withstand the complete loss of his investment in the Units or to bear the cost of the investment for an indefinite period of time. *Id.*

The Subscription Agreement, executed by each investor before the Closing Date, repeatedly disclosed the risky nature of the investment in the Units. In each Subscription Agreement, each investor represented and warranted to SIG, among other things, the following:

(e) The undersigned has been furnished and *has carefully read the [PPM].* The undersigned understands, acknowledges, agrees and is aware that:

\* \* \* \* \* \*

(v) *The Units are speculative investments which involve a high degree of risk and the potential loss of the undersigned's entire investment,*

(f) The undersigned and its purchaser representative (if applicable), have such knowledge and experience in business matters that the undersigned is capable of evaluating and has evaluated the merits and risks of the proposed investment.

(g) *The undersigned has carefully reviewed and understands the risks of a purchase of Units* including the risks set forth under "RISK FACTORS" in the [PPM] and the considerations described under "IMPORTANT INFORMATION", "SUITABILITY OF INVESTMENT", "INTERESTS OF MANAGEMENT AND OTHERS IN CERTAIN TRANSACTIONS", and elsewhere in the [PPM].

(h) In connection with the undersigned's investment in the Units the undersigned has obtained the advice of the undersigned's own investment advisors, counsel and accountants ("investment advisors").

\* \* \* \* \* \*

(*l*) The undersigned has the financial ability to bear the economic risk of the undersigned's investment in the Units and *has adequate net worth and means of providing for the undersigned's current needs and contingencies to sustain a complete loss of the undersigned's investment* and has no need for liquidity in the undersigned's investment in the Units.

*Id.* (emphasis added).

The PPM, provided to and read by each investor as represented in the Subscription Agreement, contains numerous provisions placing each investor on actual notice of the risky nature of investment in the Units. These provisions include, but are not limited to:

THE PURCHASE OF UNITS IS SUITABLE ONLY FOR INVESTORS OF SUBSTANTIAL FINANCIAL MEANS WHO HAVE NO NEED FOR LIQUIDITY OF THEIR INVESTMENT AND WHO UNDERSTAND AND CAN AFFORD THE HIGH FINANCIAL AND OTHER RISKS OF SUCH AN INVESTMENT INCLUDING THE RISK OF LOSING THEIR ENTIRE INVESTMENT. (PPM at 1) (capitalization in original)

THERE ARE OTHER SIGNIFICANT RISKS INVOLVED IN THIS OFFERING, AND PROSPECTIVE INVESTORS ARE URGED TO CAREFULLY REVIEW THE RISK FACTORS SECTION OF THIS OFFERING MEMORANDUM. (*Id.*) (capitalization in original)

ANY REPRESENTATIONS (WHETHER ORAL OR WRITTEN) OTHER THAN THOSE SET FORTH IN THIS OFFERING MEMORANDUM SHOULD NOT BE RELIED UPON. (*Id.* at 2) (capitalization in original)

Investment in the units involves a high degree of risk and is suitable only for persons having substantial financial resources and who understand the long-term nature, tax consequences and risks associated with these types of investments. Each investor must be able to bear the economic risk of his investment for an indefinite period of time. (*Id.* at 10)

[T]he units should not be purchased by an investor unless he meets the following suitability requirements ... (2) he can bear the economic risk of losing his entire investment; *and* (3) he has adequate means of providing for his current needs and personal contingencies and has no need for liquidity in his investment in the Units.... (*Id.*)

The units offered by this offering memorandum involve a high degree of risk and are suitable only for investors of substantial financial means who have no need for liquidity of their investment and who understand and can afford the high financial and other risks of such investments including the risk of losing their entire investment. (*Id.* at 12)

[R]ules and practices respecting underwriting, claims handling and claims reserves have yet to be fully tested and continue to undergo revision; the accounting system is still developing; reinsurance coverage is in the process of being renegotiated; and the marketing system continues to expand and develop. *Additionally, the internal management system and functional organization of the Issuer and the Existing Insurance Companies are still in the process of being developed. Lines of responsibility are not clearly delineated; policies and procedures are still being formulated; and a mid-level management hierarchy has yet to evolve.* (*Id.*) (emphasis added)

*[A]lthough the Existing Insurance Companies' premium volume has increased, as of December 31, 1985, it had still to reach the levels required for the Issuer and the Existing Subsidiaries, on a consolidated basis, to operate profitably....* (*Id.*) (emphasis added)

[T]he future profitability of the Issuer's and the Existing Insurance Companies' operations cannot be predicted with any certainty. (*Id.*)

*[T]he underwriters presently employed by the Issuer have limited experience in underwriting surety reinsurance. No assurances can be given that the Issuer is adequately staffed to properly manage the Insurance Subsidiaries. The lack of proper management or underwriting would have a material adverse affect on the future profitability of the Insurance Subsidiaries.* (*Id.* at 13) (emphasis added)

If ... the insurance subsidiaries' losses and expenses should exceed their underwriting and net investment income, the insurance subsidiaries will incur net losses. These losses *might be substantial, in which case investors might sustain a loss of all or a substantial part of their investment.* (*Id.* at 14) (emphasis added)

The financial forecasts consist of prospective financial statements that present, to the best of the Issuer's knowledge and belief, the expected financial position and results of operations of the companies that are the subject of such forecasts. The financial forecasts are based on the Issuer's assumptions reflecting the conditions it expects to exist and the course of action it expects to take. Assumptions made by the Issuer include, but are not limited to, assumptions respecting premiums written and earned, losses and loss adjustment expenses, commissions and other underwriting expenses, income taxes and investments. *There is no way to effectively predict that future actual events or conditions will correspond with these assumptions. Actual results achieved during the forecast period may vary materially from the financial forecasts.* Therefore, no representation or war-

*ranty of any kind is or can be made respecting the realization of the results set forth in the financial forecasts. (Id. at 17) (emphasis added)*

Lines of responsibility are not yet clearly delineated; policies and practices are still being formulated; and a mid-level management hierarchy has yet to evolve. (*Id.* at 26)

*Because of the limited operating history of the existing insurance companies, the balance sheet reserves to date are not likely to be predictive of future results.* Accordingly, it is not appropriate to extrapolate future redundancies or deficiencies based on these tables. (*Id.* at 33) (emphasis added)

Although the Issuer has underwriters experienced in underwriting surety insurance, *the underwriters presently employed by the Issuer have limited experience in underwriting surety reinsurance.* (*Id.* at 40) (emphasis added)

These reserve [loss, loss adjustment expense and premium reserves] amounts necessarily will be imprecise since they represent predictions of future events. (*Id.*)

*There can be no assurance that Southeastern Reinsurance will be able to engage in a retrocession program that will adequately protect it against large losses at a cost that will enable it to earn a profit. (Id.* at 41) (emphasis added)

Lipkind Cert., Ex. 1.

The PPM stated all officers and directors of SIG collectively owned 33.5% of the common stock. PPM at 48. The PPM also contained professional profiles of the directors and officers of SIG. *Id.* at 42–43. The PPM incorporated the DHS accountants' report of SIG and its subsidiaries. DHS also reported on the financial forecasts of the management of SIG which were attached as exhibits to the PPM.

### D. The Second Amended Complaint

The Second Amended Complaint alleges two distinct sets of claims. First, on behalf of a putative class of similarly situated investors,[6] the plaintiffs seek to recover their investment losses due to alleged fraudulent misrepresentations in connection with the Private Offering (the "Pre–Investment Conduct"). Complaint, ¶¶ 1, 2. The securities fraud claims are asserted against the "Investment Defendants," namely all defendants except Littenberg, Olstein, Sparber and Sabato. *Id.*, 35. Second, the plaintiffs seek to recover derivatively with regard to corporate waste, mismanagement, fraud and related activities at SIG which allegedly occurred subsequent to the Private Offering (the "Post–Investment Conduct"). *Id.*, ¶¶ 1, 3.

The Pre–Investment Conduct is summarized in paragraphs 63 through 71 of the Second Amended Complaint. Paragraph 68 alleges: "In essence, SIG and its subsidiaries were portrayed as having adequate reserves, a reasonable expectation of profitability and suitable expertise for their operations. There was, however, no adequate disclosure of the lack of expertise, near insolvency, utter failure to comply with basic insurance industry standards and anomalous operating procedures which permeated SIG...." *Id.*, ¶ 68.

Paragraph 68 refers to the PPM in two places:

(b) ... Th[e] lack of internal controls, and the failure to timely disclose said conditions, rendered financial statements disseminated by SIG, including those made part of the 4/30/86 PPM, inherently inaccurate and misleading, and substantially more favorable than a true portrayal of SIG would have been;

. . . . .

(h) Underwriting operations were conducted in a negligent and reckless manner. Defendants misrepresented in the 4/30/86 PPM that there was a conservative underwriting plan, and failed to disclose that underwriting was not conserv-

---

**6.** The putative class excludes the defendants and persons or entities directly related to them. Second Amended Complaint, ¶ 40. To date, the plaintiffs have not moved for certification of the class pursuant to Fed.R.Civ.P. 23.

ative at all. [The failure to establish underwriting procedures] was directly contrary to express representations made in the 4/30/86 PPM that authority limits were established for certain underwriters and a system of limited delegation existed. The Investment Defendants knew that statements, made in the 4/30/86 PPM and Best's Insurance Reports in 1984, that SIG had business volume conservative in relation to surplus were false and misleading.

*Id.*

Paragraph 69 of the Second Amended Complaint alleges:

> 69. Defendants N. PRUPIS and R. PRUPIS defrauded plaintiffs by issuing an employment agreement to Cabot Financial Corp. ("Cabot"), in exchange for the purchase of an investment unit by Cabot's owner, Keith Marshall. This was not disclosed in the 4/30/86 PPM. Mr. Marshall's employment agreement eventually became the subject of litigation between Cabot and SIG.

*Id.,* ¶ 69.

In addition to these allegations, the Second Amended Complaint sets forth specific claims against the LLPP Defendants relating to the Pre–Investment Conduct. Paragraph 53 states:

> 53. LLPP, a New Jersey law firm, was actively involved in soliciting investors in SIG from amongst its clientele and others.... *Through express oral and/or written representations made to potential investors,* certain members of LLPP ... represented that SIG and its operating subsidiaries were financially stable at the time and that there was tremendous potential for growth on the part of SIG and its subsidiaries. *As a result of such representations, these potential investors in SIG, who are cer-*

*tain of the plaintiffs herein, were led to believe that the purchase of SIG units was a sound investment and that a return on their investments was virtually guaranteed.* SIG (along with its subsidiaries) was also represented as being a well organized company, conservative in its evaluation of risks.

Second Amended Complaint, ¶ 53 (emphasis added).[7]

The Post–Investment Conduct involves alleged "abuses" by the directors and officers of SIG as well as LLPP "to utilize SIG as a conduit for personal profit and gain, at SIG's expense." *Id.,* ¶ 74. Paragraphs 73 to 75 of the Second Amended Complaint set forth specific allegations involving financial abuses, such as the sale of SIG property to officers of SIG without board approval (*id.,* ¶ 74(a)(ii)), the granting of mortgages to SIG officers and directors to assist in personal situations (*id.,* ¶ 74(a)(viii)), extortion of contractors (*id.,* ¶¶ 74(c) & 75(b)) and numerous other acts of profiteering or self-dealing by SIG officers or directors.

In addition to the specific allegations of paragraphs 73 to 75, the Second Amended Complaint contains general allegations relating to the inadequate training or lack of experience of SIG management and staff, *id.,* ¶ 58, the intentional use of SIG as a vehicle for illicit personal profit, *id.,* ¶ 59, and the reckless or intentional failure of SIG management to monitor the company's financial demise. *Id.,* ¶ 60.

The Second Amended Complaint asserts thirteen separate state and federal causes of action. Of concern here are the federal claims under the Securities Act of 1933 (the "1933 Act"), the Securities and Exchange Act of 1934 (the "1934 Act") and RICO. The federal claims are contained in First through Fourth and Eighth Counts of the Second Amended Complaint.[8] The securi-

---

7. Paragraph 53 goes on to allege:
 LLPP profited from the offering through continued provision of ostensible legal services to SIG for inflated fees. Both prior to and after the offering of the Units, LLPP and the LLPP members named as defendants herein used SIG as a "cash cow", fraudulently billing various entertainment and other non-business expenses to SIG as though they were business

expenses. LLPP and the LLPP members, before and after the offering, rendered inadequate legal advice to SIG regarding SIG's reserves and other subject matters.
 *Id.*

8. The remaining counts of the Second Amended Complaint allege violations of state statutes or common law. They include claims under the

ties fraud claims under the 1933 and 1934 Acts relate to the Pre–Investment Conduct of the Investment Defendants. The RICO claims relate both to Pre–Investment Conduct and Post–Investment Conduct of certain defendants.

### 1. Federal Securities Law Claims

Count One of the Second Amended Complaint alleges the Investment Defendants violated sections 12(2) and 15 of the 1933 Act, 15 U.S.C. §§ 77*l*(2) & 77*o*, by failing to disclose or by misstating material facts in the PPM in connection with the solicitation of the plaintiffs in the Private Offering. The specific allegations of misrepresentations are set forth in paragraphs 68 and 69, as discussed previously. Second Amended Complaint, ¶¶ 81–82.

Count Two of the Second Amended Complaint alleges violations of section 10(b) of the 1934 Act, 15 U.S.C. § 78*j*(b), and Rule 10b–5 of the SEC promulgated thereunder, in that the Pre–Investment Conduct constituted part of a scheme to defraud the plaintiffs or other investors in SIG. The plaintiffs further allege Pre–Investment Conduct caused plaintiffs to purchase Units of SIG which were valueless or substantially reduced in value from the day the plaintiffs purchased them. Second Amended Complaint, ¶¶ 86–88.

In the Third Count of the Second Amended Complaint, the plaintiffs assert the Investment Defendants are liable for aiding and abetting the violations of Rule 10b–5 alleged in the Second Count. The Fourth Count of the Second Amended Complaint asserts controlling person liability of the

directors and officers of SIG (who are also Investment Defendants) under section 15 of the 1933 Act, 15 U.S.C. § 77*o* and section 20 of the 1934 Act, 15 U.S.C. § 78*t*.

### 2. RICO Claims

The plaintiffs' claims under RICO are set forth in the Eighth Count of the Second Amended Complaint. All the defendants except SIG, LLPP, DHS, Lampf and Petigrow are defined as "RICO Defendants." *Id.*, ¶ 37.

The Eighth Count states the plaintiffs are suing in two separate capacities: *directly* on behalf of the class of shareholders for harm suffered as a result of the Pre–Investment Conduct (the "Direct RICO Claim") and *derivatively* on behalf of SIG for harm suffered as a result of the Post–Investment Conduct of the RICO Defendants (the "Derivative RICO Claim"). Second Amended Complaint, ¶ 107. The Derivative RICO Claim is brought by the plaintiffs on behalf of the bankruptcy estate of SIG.

Despite the clear language of paragraph 107 which divides the plaintiffs' RICO claims into two separate causes of action,[9] the operative allegations of the Eighth Count combine those separate causes of action into one "overall, ongoing scheme" to sell fraudulent investments in SIG and to engage in profiteering and self-dealing of SIG subsequent to the Private Offering. *Id.*, ¶ 110. Analysis of the plaintiffs' RICO claims is not possible, however, without separating the allegations which relate to the Direct RICO Claim from those which relate to the Derivative RICO Claim.

---

New Jersey Uniform Securities Laws, N.J.S.A. 49:3–46 *et seq.* (Count Five), common law fraud (Count Six), common law negligent misrepresentation (Count Seven), the New Jersey RICO, N.J.S.A. 2C:41–1 *et seq.* (Count Nine), common law negligence (Count Ten), breach of fiduciary duty (Count Eleven), common law waste, depletion and diversion of SIG's corporate assets (Count Twelve), the Florida General Corporation Law, Fla.Stat. § 607.1645 (Count Thirteen), common law breach of contract, malpractice, negligence and gross negligence (Counts Fourteen and Sixteen) and default under plaintiffs' subordinated debentures (Count Seventeen).

**9.** Paragraph 107 of the Second Amended Complaint states:

[Count Eight] is brought by plaintiffs *directly against SIG and the RICO Defendants* regarding plaintiffs' investment losses, and *derivatively against the RICO Defendants* regarding harm to SIG.

Second Amended Complaint, ¶ 107 (emphasis added).

The Wherefore Clause of Count Eight requests relief for both the Direct and the Derivative RICO Claims:

WHEREFORE, plaintiffs demand damages judgment for themselves and for SIG (for the derivative claims) and SIG (for the non-derivative claims)....

*Id.*, Count Eight.

With regard to the Direct RICO Claim, it is clear the plaintiffs seek to recover from SIG and the RICO Defendants the cost of the investment in SIG. This claim is predicated upon the Pre–Investment Conduct which is also the basis of the federal securities law claims of the First through Fourth Counts of the Second Amended Complaint.

This conclusion is apparent from the allegations of paragraph 114, which states:

114. Throughout the pattern of racketeering activity, SIG was both the victim and the beneficiary. It benefitted insofar as monies were derived from shareholders; it was the victim insofar as monies were wrongfully taken from SIG or wrongfully diverted from SIG by the RICO Defendants, and insofar as it was the vehicle of wrongful activity conferring civil liability upon it.

Second Amended Complaint, ¶ 114. According to the allegations of the Second Amended Complaint, SIG was the beneficiary of the activities of the RICO Defendants to the extent SIG received capital from the Private Offering. Thus, the Direct RICO Claim relates to Pre–Investment Conduct.

This conclusion is supported by the discussion of the facts in the Second Amended Complaint. Paragraphs 63 to 71 of the Second Amended Complaint fall under the heading "Facts Particularly Pertaining to Investment Claims." Second Amended Complaint, ¶¶ 63–71. By contrast, paragraphs 73 to 75 describe the "Facts Particularly Pertaining to the Post–Investment Derivative Claims." Id., ¶¶ 73–75 (emphasis added). Paragraph 73 clearly states: "These claims are brought by the shareholder plaintiffs derivatively on behalf of SIG." Id., ¶ 73. It follows that the Derivative RICO Claim is based upon the Post–Investment Conduct of the RICO Defendants.

Count Eight of the Second Amended Complaint must therefore be read as two separate causes of action: (1) the Direct RICO Claim against SIG and the RICO Defendants and (2) the Derivative RICO Claim on behalf of SIG against the RICO Defendants. Id., ¶ 107. The Direct RICO Claim, as the federal securities claims, is based upon the Pre–Investment Conduct of the RICO Defendants as alleged in paragraphs 63 to 71 of the Second Amended Complaint. The Derivative RICO Claim is based upon the Post–Investment Conduct as alleged in paragraphs 73 to 75 of the Second Amended Complaint.

### E. Related Litigation

The failure of SIG spurred several lawsuits in addition to the instant action. Defendant Beck, a former president and director of SIG, brought suit against SIG and its directors in the Circuit Court of Dade County, Florida (the "Beck Litigation"). Plaintiffs' Brief, Ex. C. Beck sought damages for conduct of the directors of SIG which is identical to the Post–Investment Conduct of the plaintiffs in this action. In fact, many of the allegations of the Second Amended Complaint relating to the Post–Investment Conduct repeat verbatim the allegations of the complaint in the Beck Litigation. Id.

The Plaintiffs claim they had no reason to know of or suspect the facts upon which this lawsuit is based until they received notice of the Beck Litigation. Paragraph 71 of the Second Amended Complaint states:

71. Notwithstanding their diligence, plaintiffs did not discover or have cause to suspect or investigate [the] misrepresentations or omissions [of the Investment Defendants], until shortly after May 1989, *when the Beck Litigation commenced in Florida state court.*

Second Amended Complaint, ¶ 71 (emphasis added).

In August 1989, LLPP commenced an action in the District of New Jersey against DHS and special securities counsel for SIG in connection with the Private Offering. In that action, LLPP requests declaratory judgment that it was not at fault in the event that the PPM is determined to contain material misstatements or omissions of fact. Plaintiffs' Brief, Ex. B. In January 1990, certain directors of and investors in SIG commenced an action in the Superior Court of New Jersey, Essex County,

against DHS asserting claims similar to those of the instant Second Amended Complaint. Plaintiffs' Brief, Ex. D. The bankruptcy proceeding of SIG is currently pending in the Southern District of Florida.

*Discussion*

The defendants have brought motions for summary judgment and to dismiss the Second Amended Complaint. LLPP has moved for summary judgment as to the federal securities claims in the First through Fourth Counts of the Second Amended Complaint arguing, *inter alia,* that the claims are time-barred under the applicable one year statute of limitations.

Other defendants have brought motions to dismiss the federal securities claims for the reasons stated by LLPP and because the pleadings fail to state viable causes of action under the 1933 Act or the 1934 Act. Defendants moving to dismiss the federal securities claims pursuant to Fed.R.Civ.P. 12(b)(6) include DHS, Shible, and the LLPP Defendants. In addition, defendants Bellezza, Sabato, Paulus, Olstein and Mezey have moved to dismiss the First through Thirteenth Counts of the Second Amended Complaint as alleged against each of them.

Bellezza, Sabato, Paulus, Olstein and Mezey have moved to dismiss the Eighth Count of the Second Amended Complaint for the reasons that the RICO statute is unconstitutionally vague, the existence of racketeering acts are not pleaded with particularity and the plaintiffs have failed to plead the elements of RICO.

### A. *Federal Securities Laws Claims*

#### 1. Standard of Review

Regarding the motion for summary judgment on the issue of the statute of limitations on the federal securities law claims, the standard of review is as follows:

> To prevail on a motion for summary judgment, the moving party must establish "there is no genuine issue as to any material fact and that [it] is entitled to judgment as a matter of law." Fed.R. Civ.P. 56(c). The district court's task is to determine whether disputed issues of fact exist, but the court cannot resolve factual disputes in a motion for summary

judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249–50 [106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202] (1986). All evidence submitted must be viewed in a light most favorable to the party opposing the motion. *See Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587 [106 S.Ct. 1348, 1356, 89 L.Ed.2d 538] (1986).

Although the summary judgment hurdle is a difficult one to overcome, it is by no means insurmountable. As the Supreme Court has stated, once the party seeking summary judgment has pointed out to the court the absence of a fact issue,

> its opponent must do more than simply show that there is some metaphysical doubt as to the material facts.... In the language of the Rule, the non-moving party must come forward with 'specific facts showing that there is a *genuine issue for trial.'* ... Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'

*Matsushita,* 475 U.S. at 586–87 [106 S.Ct. at 1355–56] (emphasis in original, citations and footnotes omitted).

The Supreme Court elaborated on the standard in *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 249–50 [106 S.Ct. at 2510–11] (citations omitted): "If the evidence [submitted by a party opposing summary judgment] is merely colorable ... or is not significantly probative ... summary judgment may be granted." The Supreme Court went on to note in *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–24 [106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265] (1986) (footnote omitted): "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and we think it should be interpreted in a way that allows it to accomplish this purpose." Thus, once a case has been made in support of summary judgment, the party opposing the motion · has the affirmative burden of coming forward with *specific* facts evi-

dencing a need for trial. *See* Fed.R. Civ.P. 56(e).

*Cammer v. Bloom*, 711 F.Supp. 1264, 1279–80 (D.N.J.1989).

### 2. Statute of Limitations

An action based upon section 12(2) of the 1933 Act [10] must be commenced [11] "within one year after discovery of the untrue statement or omission, or after such discovery should have been made by the exercise of reasonable diligence." 15 U.S.C. § 77*m.* The statute of limitations further provides that no such action may be brought beyond three years after the date of sale of the securities. *Id.* The latter time limit is inapplicable to the case at bar because the plaintiffs commenced this action on 10 August 1989, the day before the expiration of three years from the Closing Date. Tr. at 7.

■ Liability of a controlling person under section 15 of the 1933 Act [12] is derivative of section 12(2) and the limitations period is therefore the same. *Herm v. Stafford,* 663 F.2d 669, 679 (6th Cir.1981); *Hill v. Equitable Trust Co.,* 562 F.Supp.

1324, 1341 (D.Del.1983). The one year limitations period is also applicable to claims under section 10(b) of the 1934 Act [13] and Rule 10b–5 promulgated thereunder.[14] *McCarter v. Mitcham,* 883 F.2d 196, 202 (3d Cir.1989); *Gatto v. Meridian Medical Assoc.,* 882 F.2d 840 (3d Cir.1989), *cert. denied,* —— U.S. ——, 110 S.Ct. 1136, 107 L.Ed.2d 1041 (1990); *In re Data Access Systems Securities Litigation,* 843 F.2d 1537, 1550 (3d Cir.) (in banc), *cert. denied,* 488 U.S. 849, 109 S.Ct. 131, 102 L.Ed.2d 103 (1988); *Elysian Fed. Sav. Bank v. First Interregional Equity Corp.,* 713 F.Supp. 737, 741 (D.N.J.1989). Thus, summary judgment must be granted in favor of the Investment Defendants on the First through Fourth Counts of the Second Amended Complaint if the plaintiffs, in exercising reasonable diligence, knew or should have known of the existence of the alleged fraud more than one year prior to 10 August 1989, the date this action was commenced.

The plaintiffs argue the Second Amended Complaint is timely because it was filed within one year after May 1989, the time when the plaintiffs learned of the existence

**10.** Section 12 of the 1933 Act provides in part as follows:

> Any person who ... (2) offers or sells a security ... by means of a prospectus ... which includes an untrue statement of a material fact or omits to state a material fact ... shall be liable to the person purchasing such security from him....

15 U.S.C. § 77*l.*

**11.** "A civil action is commenced by filing a complaint with the court." Fed.R.Civ.P. 3.

**12.** This statute provides in part:

> Every person who, by or through stock ownership, agency, or otherwise ... controls any person liable under sections 77*k* or 77*l* of this title, shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist.

15 U.S.C. § 77*o.*

**13.** Section 10(b) provides:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or any facility of any national secu-

rities exchange ... (b) [t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78*j.*

**14.** Rule 10b–5 states:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
>
> (a) To employ any device, scheme, or artifice to defraud,
>
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,
>
> in connection with the purchase or sale of any security.

17 C.F.R. 240.10b–5.

of their cause of action by the commencement of the Beck Litigation. Second Amended Complaint, ¶ 71. The plaintiffs also argue they could not have known of the existence of the fraud prior to the filing of the Beck Litigation because the directors and officers of SIG did not disclose, and actively sought to "paper over," the financial problems at SIG. Plaintiffs' Brief at 2 & 26.

The statute of limitations of section 12(2) of the 1933 Act runs not from "the time at which a plaintiff becomes aware of all of the various aspects of the alleged fraud, but rather [from] the time at which plaintiff *should* have discovered the general fraudulent scheme." *Berry Petroleum Co. v. Adams & Peck*, 518 F.2d 402, 410 (2d Cir.1975) (emphasis added); *see Elysian Fed. Sav.*, 713 F.Supp. at 745; *Bradford–White Corp. v. Ernst & Whinney*, 699 F.Supp. 1085, 1091 (E.D.Pa.1988), *rev'd on other grounds*, 872 F.2d 1153 (3d Cir.), *cert. denied*, —— U.S. ——, 110 S.Ct. 542, 107 L.Ed.2d 539 (1989); *Gruber v. Price Waterhouse*, 697 F.Supp. 859, 863–64 (E.D. Pa.1988).

█ Securities plaintiffs may not leisurely await prosecution of their claims in defiance of "storm warnings." *Elysian Fed. Sav.*, 713 F.Supp. at 745 (quoting *Bradford–White Corp.*, 699 F.Supp. at 1091); *see Cook v. Avien, Inc.*, 573 F.2d 685, 697 (1st Cir.1978); *Klein v. Bower*, 421 F.2d 338, 343 (2d Cir.1970); *Gruber*, 697 F.Supp. at 863. "It is generally the case that a claim accrues in a federal cause of action as soon as a potential claimant either is aware, or should be aware, of the existence of and source of injury, not when the potential claimant knows or should know that the injury constitutes a legal wrong." *Keystone Ins. Co. v. Houghton*, 863 F.2d 1125, 1127 (3d Cir.1988); *see also Bradford–White Corp.*, 699 F.Supp. at 1091 (citing *Jensen v. Snellings*, 841 F.2d 600, 606 (5th Cir.1988)).

### 3. Notice of the Pre–Investment Conduct

The Investment Defendants argue the plaintiffs' federal securities law claims are time barred because the plaintiffs were on inquiry notice of the Pre–Investment Conduct as of the Closing Date and failed thereafter to exercise reasonable diligence regarding the alleged omissions from or misstatements contained in the PPM. According to the Second Amended Complaint, the LLPP Defendants represented to the plaintiffs that SIG was a sound investment, financially secure and a well-organized company. Second Amended Complaint, ¶ 53. The PPM, however, directly contradicted these assertions in specific terms. The Investment Defendants argue it is inexcusable that the plaintiffs did not investigate these contradictions until the Beck Litigation was filed nearly three years after the Closing Date.

In support of their argument, the Investment Defendants rely on *Kennedy v. Josephthal & Co.*, 814 F.2d 798 (1st Cir.1987). In *Kennedy*, purchasers of worthless shares of a coal mining limited partnership had brought an action in December 1979 under section 12(2) of the 1933 Act against a broker, Sinclair, who had sold the shares to the investors. Sinclair had lead the investors to believe, through oral representations prior to the sale, that the investment was safe, the partnership had already started to produce coal and the brokerage firm had investigated and would continue to monitor the operations of the partnership to ensure that they were bona fide. Without determining whether the misrepresentations had been made, the district court granted summary judgment in favor of Sinclair because the action had not been commenced until December 1981, two years after the sale of the shares. *Id.* at 800.

The confidential offering memorandum pursuant to which the investors in *Kennedy* had purchased their shares had been "replete with warnings," for example: the offering involved a high degree of risk, only general partners were authorized to give information regarding the partnership and information not contained in the memorandum was not to be relied upon. *Id.* at 801. Similar to the PPM in this case, the offering memorandum in *Kennedy* contained a list of risk factors. The offering

memorandum cautioned, among other things, "mining operations would be unprofitable at the prevailing price of coal even if the operation fully developed the field." *Id.* The *Kennedy* court noted:

> The warnings, designed to protect the offeror, revealed that [the partnership] would, in all likelihood, utterly fail as a viable coal mining operation. Appellants nevertheless executed documents stating that they had read the offering memorandum, appreciated the risks involved, and could afford to lose their investment.

*Id.*

Based upon the warnings in the offering memorandum, the *Kennedy* court adopted the reasoning and conclusion of the district court that the claims regarding misrepresentations in the offering memorandum were not timely filed. The court of appeals described the situation as follows:

> We are faced here with the great glowering clouds of the offering memorandum and the quite different forecast of Sinclair. For example, the offering memorandum, after warning that only the general partner is authorized to give any information concerning the partnership, went on to note that the operation would not be profitable at the prevailing price of coal. Sinclair, not a general partner, apparently announced the opposite. *A reasonable investor would have at least enquired as to this glaring difference but instead appellants, according to their own version, relied on the more favorable assessment.*

*Id.* at 802 (emphasis added).

Noting that the contradictions between the oral representations of Sinclair and the offering memorandum could not logically coexist, the *Kennedy* court held the investors were required at least to attempt to resolve these contradictions. The court concluded the investors were on inquiry notice at the time they received the offering memorandum. Because the investors had not exercised diligence or attempted to uncover the basis for the contradictions until two years after the sale of the shares, the *Kennedy* court affirmed the dismissal of the investors' cause of action. *Id.*

The reasoning of *Kennedy* was followed in *Platsis v. E.F. Hutton & Co.*, 642 F.Supp. 1277 (W.D.Mich.1986), *aff'd*, 829 F.2d 13 (6th Cir.), *cert. denied*, 485 U.S. 962, 108 S.Ct. 1227, 99 L.Ed.2d 427 (1987). In *Platsis*, a wealthy, sophisticated investor had purchased shares in eight oil and gas limited partnerships over the course of one and one-half years. 642 F.Supp. at 1287. The plaintiff had read the offering documents completely and acknowledged the high risks disclosed in the documents. *Id.* As in *Kennedy*, the plaintiff claimed he had purchased the securities in reliance upon the contrary representations of the broker who had sold the shares. *Id.* at 1289.

Relying on the reasoning of the district court in *Kennedy*, the district court in *Platsis* held the plaintiff had been on inquiry notice of the potential for fraud at the moment of receipt of the offering documents, which he had read and understood and which, as in *Kennedy*, were "wholly inconsistent with any promise of 'guaranteed' returns." *Id.* at 1292. The *Platsis* court held:

> [U]pon receipt and review of the [offering] materials, plaintiff unquestionably knew or certainly should have known that any suggestion of a promised return, if actually made, was made without any factual basis, was of questionable merit and potentially false. At that time, the statute of limitations began to run with respect to those alleged representations.

*Id.* On appeal, the Sixth Circuit affirmed the decision without discussion, noting that the First Circuit had affirmed the district court holding in *Kennedy*. 829 F.2d at 13.

■ The rule of these cases is clear: oral representations which are made prior to the purchase of securities and which are directly contradicted by the written representations of the offering memoranda are, for purposes of the statute of limitations, sufficient to place a reasonable investor who has read the memoranda on inquiry notice of federal securities fraud. *Kennedy*, 814 F.2d at 802; *Platsis*, 642 F.Supp. at 1292.

Courts in this Circuit have not addressed the issue, but it appears no court which has considered *Kennedy* has rejected its reasoning. *See, e.g., Ebrahimi v. E.F. Hutton & Co.*, 852 F.2d 516, 523 (10th Cir.1988) (statements which alert investor that "something may have been amiss" are sufficient to put investor on inquiry notice and trigger duty to exercise reasonable diligence); *Levin v. Arneault*, No. G88-237 CA, slip op. at 8, 1989 WL 223014 (W.D. Mich. 22 Dec.1989) (LLPP Brief, Ex. A) (discrepancies between prospectus and oral representations of issuers of limited partnership sufficient to place investors on inquiry notice). *Cf. Luksch v. Latham*, 675 F.Supp. 1198, 1200–01 (N.D.Cal.1987) (where investors did not read prospectus, *Kennedy* does not apply and commencement of limitations period may not be decided as a matter of law).

■ In this case, the PPM repeatedly warned potential investors that SIG was not currently operating at a profit and SIG's future profitability could not be predicted with any certainty because of its limited operating history and other factors. The PPM also stated SIG's profitability would be adversely effected by high operating expenses, the lack of experience of underwriters and management employed by SIG and other factors. PPM at 12–17.

These cautionary statements directly contradicted the alleged misrepresentations of the LLPP Defendants to the effect that a return on the investment was "virtually guaranteed." Second Amended Complaint, ¶ 53. Additionally, the PPM *contradicted* alleged representations that SIG was a "well organized company." *Id.* The PPM repeatedly warned that internal controls had not been developed. PPM at 12–13, 26.

The plaintiffs cannot argue they did not know of the contradictions between the alleged oral misrepresentations and the terms of the PPM. *See Brown v. The E.F. Hutton Group*, 735 F.Supp. 1196, 1202 (S.D.N.Y.1990) (offering memoranda which "did not stress risks" sufficiently contradicted alleged oral misrepresentations and plaintiffs could not reasonably rely on memoranda to conclude investment was

low risk) (Walker, Cir. J., sitting by designation); *Arrizza v. Jefferson Guar. Bank*, 696 F.Supp. 204, 208 (E.D.La.1988); *Bender v. Rocky Mountain Drilling Assoc.*, 648 F.Supp. 330, 334–35 (D.D.C.1986). *Cf. Luksch*, 675 F.Supp. at 1200 (distinguishing *Kennedy* where investors did not read prospectus).

In *Bruschi v. Brown*, 876 F.2d 1526 (11th Cir.1989), an unsophisticated investor, Bruschi, purchased stock from a broker, Brown, whose misrepresentations as to the financial condition of the company were contradicted by the terms of the offering memorandum. Some of the misrepresentations of Brown were consistent with the offering memorandum and Bruschi argued reliance on the oral misrepresentations was reasonable for purposes of establishing a claim under section 10(b) of the 1934 Act. *Id.* at 1529.

In considering whether Bruschi's reliance on Brown's representations was reasonable, the Eleventh Circuit held: "The fact that *some* information in the disclosure documents would have indicated that some of Brown's alleged oral misrepresentations were reliable is a factor to consider, but this factor alone is not dispositive; all of the relevant factors must be balanced." *Id.* at 1530. The court held there was sufficient evidence to establish a genuine issue of material fact regarding reasonable reliance because Bruschi was an unsophisticated investor who did not read the offering documents and who relied on the advice of Brown, who knew the falsity of his representations. *Id.*

■ Unlike Bruschi, the plaintiffs in this case represented themselves to be sophisticated investors. More important, the plaintiffs affirmatively represented that they had received and read the PPM, including the section regarding "risk factors," which set forth at length the risks facing SIG. As in *Kennedy* and *Platsis*, the alleged oral misrepresentations of the LLPP Defendants prior to the Closing Date and the contrary representations of the PPM could not logically coexist. Application of the rule of *Kennedy* therefore appears consistent with the facts of this case.

Neither *Kennedy* nor *Platsis* nor the other cases discussed above is addressed in the Plaintiffs' Brief. At oral argument on these motions counsel stated the plaintiffs did not rely on the alleged oral misrepresentations of the LLPP Defendants. Tr. at 12–13. This comment was made despite the language of paragraph 53 of the Second Amended Complaint in which the LLPP Defendants are alleged to have represented that the investment in SIG was virtually guaranteed. In effect, the plaintiffs now argue the alleged oral misrepresentations were "soft" in the sense that they did not effect the investment decision of the plaintiffs. *Craftmatic Securities Litigation v. Kraftsow*, 890 F.2d 628, 642–44 (3d Cir. 1989).

At oral argument counsel for the plaintiffs stressed the alleged misrepresentations in the PPM itself. Specifically, it was argued the PPM misrepresented the financial condition of SIG and omitted to disclose that the officers of SIG had no experience in the underwriting industry, that SIG had not established loss reserves and that the company was not conservatively managed.

The Investment Defendants responded to the arguments of the plaintiffs on two levels. First, the Investment Defendants argue the PPM disclosed the high risks involved in the Private Offering. There is no dispute that the PPM repeatedly warned investors that the Private Offering was a high risk venture and that potential investors stood a risk of losing their entire investment. PPM at 1, 10–12. The plaintiffs' abandonment of their claim of reliance on oral representations underscores this point.

The Investment Defendants further point to disclosures in the PPM which indicate $27,000,000 of the capital raised in the Private Offering was to be put in SRC, the newly-created subsidiary of SIG which was to be in the reinsurance business. *Id.* at 16, 17, 38. The PPM disclosed that SRC had no certificate of authorization, no employees and would not have a rating in Best's Insurance Reports until 1990 at the earliest. Tr. 27–29; PPM at 11, 13, 16, 38. The PPM stated SRC had no reinsurance

treaty and would not obtain reinsurance treaties on terms as favorable as those held by the existing subsidiaries of SIG. *Id.* at 12–13. The PPM also indicated SIG "may be more likely to incur net losses during its start-up period than in later periods." *Id.* at 14.

As to the existing subsidiaries of SIG, the PPM states they were not operating at a profit in part because their low loss ratios were offset by high operating expenses. PPM at 12 & 30. The estimated loss settlement period of SIG was disclosed to be "relatively short." *Id.* at 32. While the PPM states the existing subsidiaries had established claims practices and hired employees, it states "rules and practices respecting underwriting, claims handling and claims reserves have yet to be fully tested an continue to undergo revision...." *Id.* at 12. The PPM also disclosed that "the underwriters presently employed by [SIG] have limited experience in underwriting surety insurance" and that "[n]o assurances can be given that [SIG] is adequately staffed to properly manage the Insurance Subsidiaries." *Id.* at 13; *see id.* at 26. The plaintiffs may not argue the PPM was so misleading as to eliminate the duty of inquiry on the part of the plaintiffs, who were sophisticated investors. *See Landy v. Mitchell Petroleum Technology Corp.*, 734 F.Supp. 608, 617–18 (S.D.N.Y. 1990).

The second argument of the Investment Defendants is that the plaintiffs, if they were not on inquiry notice as of the Closing Date, had notice of the alleged fraud at least one year prior to the commencement of this action. The Investment Defendants have provided data demonstrating that the plaintiffs received notice of the serious problems at SIG well in advance of the filing of this suit or the Beck Litigation. Tr. 30–31.

By letter, dated 11 April 1988, a group of investors calling itself the "Southeastern Insurance Group Stockholders Protective Committee" wrote to numerous shareholders to express the concern that SIG confronted serious management and financial difficulties. Lipkind Reply Cert., Ex. A.

The Stockholders Committee complained that poor management by the board of directors had "contributed to a disintegration of the corporate checks and balances necessary to preclude obnoxious management practices." *Id.* The letter identified potential problems with the management of SIG which are similar to or the same as the practices objected to in the Second Amended Complaint, including lax underwriting practices, excessive charging of entertainment and personal expenses to SIG, utilization of underqualified and understaffed personnel and acts of profiteering and self-dealing. The letter also notified stockholders that "the Company has thus far blocked our legal right to inspect the shareholders list necessary for us to solicit proxies...." *Id.*

By letter, dated 15 July 1988, the Board of Directors of SIG notified all shareholders of "unsettling problems" at SIG resulting in the hiring of an independent management consulting firm to evaluate the management and financial condition of SIG. *Id.*, Ex. B. The letter informed stockholders that based upon the conclusions of the independent consulting firm, SIG had terminated R. Prupis and Beck, who had been chief executive officer and president of SIG. The letter discussed corrective action which was being implemented to reverse serious problems. The Board of Directors stated it was "confident that [SIG] is a more sound company now than before our problems were recognized." *Id.*

These documents contradict the plaintiffs' empty assertion in paragraph 71 of the Second Amended Complaint that they did not "have cause *to suspect or investigate* [the] misrepresentations or omissions [of the Investment Defendants], until shortly after May 1989, when the Beck Litigation commenced in Florida state court." Second Amended Complaint, ¶ 71 (emphasis added). The submissions of the Investment Defendants establish, as a matter of law, the plaintiffs received notice of the basis for their cause of action under the federal securities laws in or about August 1986 and in no event later than 15 July 1988. This notice would have prompt-

ed a reasonable investor to inquire as to the financial affairs of SIG.

4. Exercise of Reasonable Diligence

■ The plaintiffs bear the burden of proof of compliance with the statute of limitations. *ITG, Inc. v. Price Waterhouse*, 697 F.Supp. 867, 870 (E.D.Pa.1988) (citing *Cook*, 573 F.2d at 695). In response to the inquiry whether the plaintiffs exercised reasonable diligence, the plaintiffs argue "[u]ntil the Beck suit distributed [sic] in late May 1989 to the investors, management had papered over the reasons for the SIG and subsidiary operating problems." Plaintiffs' Brief at 26. As evidence of the attempted cover-up, the plaintiffs cite to a 22 June 1989 letter from the United States Treasury Department to Michael M. Rosenbaum, Esq., corporate counsel to SIG (the "Treasury Letter"). Second Amended Complaint, Ex. C.

The Treasury Letter is apparently written in response to the request of Rosenbaum for information concerning the reasons for the Treasury Department's termination of SIG's certificates of authority to insure projects in which the federal government had an interest. The Treasury Letter states:

> Beginning in May of 1988, this Department has made SCI's Chairman of the Board completely aware of Treasury's concerns about the financial condition and lack of management control over the SCI Group. This has been accomplished in numerous letters, meetings, and phone conversations, all of which are well documented in our files. I would suggest, that if the Chairman of the Board chooses not to inform you of his discussions with the Treasury, it is a matter you should discuss with your client.

Second Amended Complaint, Ex. C.

Contrary to the claim that the Treasury Letter indicates an attempt to cover up the mismanagement of SIG, it is clear the Treasury Department knew of the serious financial difficulties at SIG and expressed its concern early in 1988. The Treasury Department also apparently engaged in extensive conversations with SIG's management concerning the problems. More signifi-

cant, the Treasury Letter is silent on the issue of whether the plaintiffs attempted to uncover the alleged fraud in the Private Offering.

The submissions of the parties indicate that the plaintiffs' claim of an attempt by management to "paper over" the problems of SIG, if it existed at all, was ineffective. The management, shareholders and the Treasury Department were aware of SIG's problems well in advance of one year prior to the commencement of this action. The Treasury Department apparently acted upon this information; the plaintiffs, on the basis of the record before the court, did not. The plaintiffs have failed to meet their burden as to the exercise of reasonable diligence.

The plaintiffs attempt to argue they have no duty to exercise diligence where the promoters of securities were in a position of trust as to the investors:

> The status of plaintiffs and the class principally as law clients of LLPP ... had a right to expect that if there were fraud, LLPP, the directors and accountants would have carried out their fiduciary duty of prompt[,] truthful, full disclosure, particularly after beguiling them to invest through less than truthful, full disclosure. *Fiduciaries should not be heard to claim that those to whom they owed a fiduciary duty should have been more diligent, in any event.*

Plaintiffs' Brief at 28 (emphasis added). The plaintiffs do not cite legal authority in support of this argument.

As the Investment Defendants point out, the plaintiffs' argument is contrary to the holding of the Third Circuit that "a shareholder cannot 'bootstrap' [a] breach of fiduciary duty claim into a § 10(b) action by alleging nondisclosure of culpability." *Craftmatic Securities Litigation,* 890 F.2d at 638–39. *Accord Kas v. Financial General Bankshares, Inc.,* 796 F.2d 508, 513 (D.C.Cir.1986). The *Craftmatic* court held that the failure to disclose an alleged breach of fiduciary duty by corporate management is not a misrepresentation actionable under the federal securities laws. *Id.* at 640. In making their unsupported

argument, the plaintiffs do not discuss the holding of *Craftmatic.*

The opinion of the Seventh Circuit in *Norris v. Wirtz,* 818 F.2d 1329 (7th Cir.), *cert. denied,* 484 U.S. 943, 108 S.Ct. 329, 98 L.Ed.2d 356 (1987), is also instructive. In an action under section 10(b) of the 1934 Act, the plaintiff in *Norris* argued for adoption of a rule of trust law which tolls the limitations period of an action against a trustee until the trustee confesses his wrongdoing or repudiates his office. *Id.* at 1333. The Seventh Circuit squarely declined to incorporate this rule into a federal securities fraud action under the 1934 Act, stating "[i]t would excuse investors from all duty of inquiry, even after they have been put on actual notice that something is amiss." *Id.* The *Norris* court concluded such a rule would run contrary to the purpose of the relatively short and absolute three-year period of repose applicable to private rights of action under the federal securities laws. *Id.*

█ While the facts of the *Norris* case are distinguishable from the instant case, the reasoning of the Seventh Circuit in declining to hold the beneficiary of a trust to a lax standard of inquiry is applicable to the plaintiffs *vis à vis* the LLPP Defendants, who are alleged to have maintained a fiduciary relationship. Even assuming the LLPP Defendants breached a fiduciary duty in offering the SIG Units to the plaintiffs, the plaintiffs may not reasonably assert an expectation of disclosure of that breach by the defendants. This is especially true as to the LLPP Defendants because the PPM and the Subscription Agreement, which were provided to and read by each investor prior to the Closing Date, disclosed the high risk involved in the Private Offering.

█ In determining whether a plaintiff exercised due diligence in investigating fraud, the existence of a fiduciary relationship is relevant. *Elysian Fed. Sav.,* 713 F.Supp. at 745. However, other factors must be considered, including "concealment of the fraud, opportunity to detect it, position in the industry, sophistication and expertise in the financial community, and

knowledge of related proceedings." *Id.* In addition, the court must consider "the nature of the misleading statements alleged, the opportunity to discover the misleading nature of the statements, and the subsequent actions of the parties." *Cook,* 573 F.2d at 696–97.

While the LLPP Defendants may have owed a fiduciary duty to the plaintiffs, this relationship did not obviate the duty of the plaintiffs—who were knowledgeable, wealthy investors and who had read the PPM—to exercise reasonable diligence in purchasing the Units of SIG and in monitoring their investment. The plaintiffs simply have failed to present evidence which creates a genuine issue of material fact as to whether they exercised any degree of diligence or whether the management of SIG prevented them from learning of the existence of financial problems at any time after the Closing Date.

> [T]he exercise of reasonable diligence requires an investor to be reasonably cognizant of financial developments relating to his investment, and mandates that early steps be taken to appraise those facts which come to the investor's attention. Although this principle is particularly true when the non-disclosed facts are negligently omitted, even where facts are fraudulently withheld a plaintiff cannot be allowed to ignore the economic status of his or her investment.

*Cook,* 573 F.2d at 698. In this case, the plaintiffs "ignore[d] the economic status of [their] investment" well beyond the time they should have known of the facts which gave rise to this lawsuit. *Id.* Therefore, summary judgment is granted in favor of the Investment Defendants as to the federal securities claims of the First through Fourth Counts of the Second Amended Complaint.

### B. *RICO Claims*

The RICO claims are brought under 18 U.S.C. § 1962(a) [15] against the RICO Defendants and/or SIG (Second Amended Complaint, ¶ 112), under section 1962(b) [16] against the RICO Defendants and/or SIG (*id.,* ¶ 113) and under section 1962(c) [17] only against the RICO Defendants (*id.,* ¶ 115). As discussed previously, the plaintiffs seek to recover under RICO on two distinct theories: (1) the Direct RICO Claim is brought against SIG and the RICO Defendants on behalf of the class of shareholders who purchased securities in the Private Offering; and (2) the Derivative RICO Claim is brought behalf of SIG against the RICO Defendants for their alleged Post–Investment Conduct.

The section 1962(a) and (b) claims are pleaded in the alternative as both Direct and Derivative RICO Claims. Because the section 1962(c) claim is asserted only against the RICO Defendants, it appears that it is based upon the Post–Investment Conduct for which SIG asserts its Derivative RICO Claim.

Plaintiffs assert the RICO claims in the Eighth Count of the Second Amended Complaint. The RICO Defendants argue the Eighth Count should be dismissed because the plaintiffs do not allege facts sufficient to make out a substantive violation of RICO.

**15.** This subsection provides:

(a) It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or through collection of an unlawful debt in which such person has participated as a principal within the meaning of section 2, title 18, United States Code, to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in ... interstate ... commerce....
18 U.S.C. § 1962(a).

**16.** This subsection provides:

(b) It shall be unlawful for any person through a pattern of racketeering activity ... to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in ... interstate ... commerce.
18 U.S.C. § 1962(b).

**17.** This subsection provides:

(c) It shall be unlawful for any person employed by or associated with any enterprise engaged in ... interstate ... commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity....
18 U.S.C. § 1962(c).

### 1. Standard of Review

Regarding the motion to dismiss the Eighth Count of the Second Amended Complaint, the standard of review does not require consideration of evidence beyond the pleadings. Because Rule 12(b)(6) results in a determination on the merits at an early stage in the plaintiffs' cause, the plaintiffs are afforded the safeguard of having all of their allegations taken as true and all reasonable factual inferences drawn in their favor. *Wisniewski v. Johns-Manville Corp.*, 759 F.2d 271, 273 (3d Cir.1985); *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir.1977). "[A] complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957). *Accord Cruz v. Beto*, 405 U.S. 319, 321, 92 S.Ct. 1079, 1081, 31 L.Ed.2d 263 (1972); *Angelastro v. Prudential–Bache Sec.*, 764 F.2d 939, 944 (3d Cir.), *cert. denied*, 474 U.S. 935, 106 S.Ct. 267, 88 L.Ed.2d 274 (1985).

### 2. Elements of RICO

The existence of a substantive violation of RICO requires a showing that the defendants (1) conducted (2) an enterprise through (3) a pattern (4) of racketeering activity.[18] *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 497–98, 105 S.Ct. 3275, 3285–86, 87 L.Ed.2d 346 (1985); *Keystone Ins. Co. v. Houghton*, 863 F.2d 1125, 1129 (3d Cir.1988); *Marshall–Silver Constr. Co. v. Mendel*, 835 F.2d 63, 65 (3d Cir.1987), *vacated on other grounds*, —— U.S. ——, 109 S.Ct. 3233, 106 L.Ed.2d 582 (1989) (*"Marshall–Silver I"*). Each of these elements must be alleged to state a claim under RICO. *Sedima*, 473 U.S. at 496, 105 S.Ct. at 3285. Injury to plaintiff's business or property is necessary to confer standing for a private plaintiff. *Id.; Keystone Ins. Co.*, 863 F.2d at 1129; *Marshall–Silver I*, 835 F.2d at 65.

"Racketeering activity" within the meaning of RICO includes state law crimes such as murder, bribery and extortion, and federal crimes such as mail fraud, wire fraud and securities fraud. 18 U.S.C. § 1961(1). For purposes of this discussion, it is assumed the Second Amended Complaint adequately pleads the existence of racketeering activity in that it alleges acts of mail, wire and securities fraud. Second Amended Complaint, ¶ 110.

The plaintiffs have alleged two distinct enterprises: (1) an "Associational Enterprise" of the RICO Defendants to engage in an "overall, ongoing scheme" to issue fraudulent stock in SIG and to use SIG as a vehicle for personal profiteering and (2) the "SIG Enterprise" consisting of SIG and its subsidiaries. *Id.*, ¶¶ 110, 111 & 113. The Associational Enterprise is alleged to exist for purposes of section 1962(a); the SIG Enterprise exists for purposes of section 1962(c). *Id.*, ¶ 112, 114. For purposes of section 1962(b), the enterprise is either the Associational Enterprise or the SIG Enterprise. *Id.*, ¶ 113.

The Supreme Court has indicated RICO is to be read broadly "to effectuate its remedial purposes." *Sedima*, 473 U.S. at 497–98, 105 S.Ct. at 3286. Complaints alleging RICO violations are held to a liberal pleading standard. *Rose v. Bartle*, 871 F.2d 331, 356 (3d Cir.1989). By pleading the Direct and the Derivative RICO Claims together in the Eighth Count of the Second Amended Complaint, the plaintiffs

---

**18.** The RICO Defendants urge the court to declare RICO to be unconstitutionally vague, relying on the dissenting opinion of Justice Scalia in *H.J. Inc. v. Northwestern Bell Telephone Co.*, —— U.S. ——, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989). The vagueness of a statute must be analyzed in the specific context in which it is applied. *United States v. Pungitore*, 910 F.2d 1084, 1104 (3d Cir.1990). Because the Direct RICO Claim fails to allege a pattern of racketeering activity under the test set forth by the Court in *H.J. Inc.*, it is unnecessary to consider the constitutionality of the statute as applied to the RICO Defendants on the Direct RICO Claim.

With respect to the Derivative RICO Claim, it appears the Post–Investment Conduct constitutes a pattern of racketeering activity within the meaning of *H.J. Inc.* As applied to the RICO Defendants, the RICO statute is not so vague that persons of ordinarily intelligence cannot understand its meaning. *Id.* Therefore, the constitutionality of the RICO statute is not at issue in this case.

created ambiguities and inconsistencies which are not easily resolved. Even assuming the Second Amended Complaint pleaded the separate RICO claims in two separate counts, however, the Direct RICO Claim must be dismissed.[19]

### 3. Direct RICO Claim

As noted previously, the Direct RICO Claim is predicated upon the Pre–Investment Conduct of the RICO Defendants. The plaintiffs correctly note that the injury from the Post–Investment Conduct was to SIG, not its shareholders. Second Amended Complaint, ¶ 114. The shareholders of a corporation do not have standing to sue for its derivative claims under RICO.[20] *Sparling v. Hoffman Constr. Co., Inc.*, 864 F.2d 635, 640 (9th Cir.1988); *Crocker v. FDIC*, 826 F.2d 347, 349 (5th Cir.1987), *cert. denied*, 485 U.S. 905, 108 S.Ct. 1075, 99 L.Ed.2d 235 (1988); *Roeder v. Alpha Indust. Inc.*, 814 F.2d 22, 29–30 (1st Cir. 1987); *Rand v. Anaconda–Ericsson Inc.*, 794 F.2d 843, 849 (2d Cir.), *cert. denied*, 479 U.S. 987, 107 S.Ct. 579, 93 L.Ed.2d 582 (1986); *Gaff v. FDIC*, 814 F.2d 311, 317, *vacated in part on other grounds*, 828 F.2d 1145 (6th Cir.1987). Had the Post–Investment Conduct been the subject of a separate derivative action by SIG, it would be clear that Post–Investment Conduct is not at issue in the plaintiffs' Direct RICO Claim.

The definition of a pattern requires at least two acts of racketeering activity within a ten year period. 18 U.S.C. § 1961(5). The Supreme Court has held "two isolated acts of racketeering activity do not constitute a pattern." *Sedima*, 473 U.S. at 496 n. 14, 105 S.Ct. at 3275 n. 14. The essential characteristics of a pattern of racketeering

activity are "continuity plus relationship" and the "threat of continuing activity." *Id.*

Recently, the Supreme Court stressed continuity and relationship in defining a pattern. *See H.J. Inc. v. Northwestern Bell Telephone Co.*, —— U.S. ——, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989). The Court explained that continuity is primarily a temporal concept: " 'Continuity' is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." *Id.* 109 S.Ct. at 2902. The pattern requirement may be satisfied by demonstrating that the predicate acts presented an implicit or explicit threat of long-term racketeering activity. *Id. See also United States v. Pungitore*, 910 F.2d 1084, 1103–04 (3d Cir.1990).

The Supreme Court held a closed-ended, single scheme may constitute a RICO pattern where the predicate acts continue over a substantial period of time. However, the Court stated: "Predicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy" the pattern requirement. *H.J. Inc.*, 109 S.Ct. at 2899.

Alternatively, where a RICO action is brought before continuity can be established, "liability depends on whether the *threat* of continuity is demonstrated." *Id.* The threat of continuity is established where

it is shown that the predicates are a regular way of conducting defendant's ongoing legitimate business (in the sense that it is not a business that exists for criminal purposes), or of conducting or

---

**19.** As discussed below, leave is granted to amend the Second Amended Complaint to set forth the allegations of the surviving, Derivative RICO Claim in a separate count. Fed.R.Civ.P. 10(b).

**20.** Similarly, the plaintiffs do not have standing to sue under section 1962(a) of RICO because the Second Amended Complaint alleges SIG, not the plaintiffs, was harmed by the investment of the income from the Private Offering. *Rose v. Bartle*, 871 F.2d 331, 357–58 (3d Cir.1989) (plaintiff must demonstrate injury from use or investment of income in the enterprise, rather than by

predicate acts of racketeering). Under section 1962(b), the plaintiffs cannot demonstrate injury from the acquisition or control of an enterprise because it was SIG, not its shareholders, which was injured by the control of the RICO Defendants. *Leonard v. Shearson Lehman/American Express Inc.*, 687 F.Supp. 177, 181 (E.D.Pa.1988); *Rich Maid Kitchens Inc. v. Pennsylvania Lumbermens Mutual Ins. Co.*, 641 F.Supp. 297, 311 (E.D.Pa.1986), *aff'd mem.*, 833 F.2d 307 (3d Cir.1987). To the extent the plaintiffs have standing to sue derivatively on behalf of SIG, those claims are discussed below.

participating in an ongoing and legitimate RICO "enterprise." *Id.*

The Third Circuit favors a case-by-case analysis of the pattern requirement which considers "a combination of specific factors such as the *number* of unlawful acts, the *length* of the time over which the acts were committed, the *similarity* of the acts, the *number* of the victims, the *number* of the perpetrators, and the *character* of the unlawful activity." *Barticheck v. Fidelity Union Bank First Nat'l State,* 832 F.2d 36, 38–39 (3d Cir.1987) (emphasis added).

The decision in *H.J. Inc.* directly impacted the *Barticheck* fact-intensive approach to the pattern requirement by defining continuity as a primarily temporal concept. *Swistock v. Jones,* 884 F.2d 755, 758 (3d Cir.1989) (noting that *H.J. Inc.* required an adjustment of the *Barticheck* test). The Third Circuit, however, subsequently reaffirmed the *Barticheck* approach to the pattern requirement, stating:

> [I]f the Court in *H.J. Inc.* intended that the *duration* of the predicate acts or the threat arising therefrom should be determinative without reference to whether the societal threat was limited to a single, one time injury, we would not have expected the Court to eschew providing a specific standard in favor of a fact oriented, case-by-case development.

*Marshall–Silver Constr. Co., Inc. v. Mendel,* 894 F.2d 593, 597 (3d Cir.1990) ("*Marshall–Silver II*") (emphasis in original).

The Third Circuit therefore declined to read *H.J. Inc.* as defining continuity solely as a temporal concept. *Id.* at 596. *Marshall–Silver II* clearly points to the size and magnitude of the fraud as being part of the pattern analysis. *Id.* at 597. The *Marshall–Silver II* court nevertheless affirmed the dismissal of a complaint because there appeared to be a single injury, the predicate acts were concluded in less than

seven months and there appeared to be no threat of additional criminal conduct. *Id.*

■ Applying the foregoing principles to the case at bar, it appears the Direct RICO Claim does not allege a pattern of racketeering activity. The Pre–Investment Conduct of the RICO Defendants consisted of single, closed-ended offering of Units of SIG through the Private Offering. While the Private Offering affected numerous individuals and consisted of numerous potential predicate acts, the time period over which the RICO Defendants are alleged to have participated in the Private Offering spans a closed period: from the issuance of the PPM on 30 April 1986 to the 11 August 1986 Closing Date. These few months are an insufficient period of time to support the claim that the Pre–Investment Conduct of the RICO Defendants constituted a substantial period of time. *Cf. H.J. Inc.,* 109 S.Ct. at 2906 (six years); *Swistock,* 884 F.2d at 759 (fourteen months).[21]

When faced with a motion to dismiss the complaint, the Third Circuit has indicated that inferences should be drawn in favor of the existence of a threat of continuing harm. *Barticheck,* 832 F.2d at 39. The Supreme Court indicated such a threat may be inferred where the racketeering activity was carried out through a legitimate business or enterprise. *H.J. Inc.,* 109 S.Ct. at 2899.

■ The plaintiffs attempt to plead the threat of continuing harm by linking the Pre–Investment Conduct to the Post–Investment Conduct for purposes of pleading a pattern of racketeering activity. This link is made through the Associational Enterprise. Second Amended Complaint, ¶ 111. By the allegations of the Second Amended Complaint, however, the Associational Enterprise did not exist for legitimate purposes; it was created to carry on the alleged illegitimate scheme of the RICO

---

**21.** Prior to *H.J. Inc.,* the Third Circuit held a single, closed-ended scheme could constitute a pattern of racketeering activity where the number of victims and perpetrators was great. *Environmental Tectonics v. W.S. Kirkpatrick, Inc.,* 847 F.2d 1052, 1063 (3d Cir.1988), *aff'd,* —— U.S. ——, 110 S.Ct. 701, 107 L.Ed.2d 816 (1990);

*Barticheck,* 832 F.2d at 39. To the extent the Supreme Court has stated the temporal element is the predominate test of a pattern of racketeering activity, *Environmental Tectonics* presents a factual scenario which might be decided differently after *H.J. Inc.*

Defendants. *Id.* It therefore cannot satisfy the *H.J. Inc.* test of continuing harm. 109 S.Ct. at 2899.

The RICO Defendants are alleged to have played significant parts in conducting an "ongoing legitimate business" through their interest in or control of the SIG Enterprise. *Id.* at 2902. As noted previously, however, the SIG Enterprise relates to section 1962(c), which is asserted in the Derivative RICO Claim. The SIG Enterprise does not appear to relate to the Direct RICO Claim.

Even assuming SIG provided the vehicle for the Pre–Investment Conduct, there is no allegation which would support the inference that the Pre–Investment Conduct "amounted to, or threatened the likelihood of, continued criminal activity." *Id.* at 2899. The plaintiffs have not alleged that the Private Offering constituted "a regular way of conducting defendant[s'] ongoing legitimate business." *Id.* The RICO Defendants were in the business of surety insurance and reinsurance, not the issuance of securities.

The Pre–Investment Conduct was not part of the defendants' regular course of business and did not threaten related and continuous criminal harm. *Cf. Swistock*, 884 F.2d at 759; *Barticheck*, 832 F.2d at 39. Drawing an inference of continuing harm is not possible because the RICO Defendants were not engaged in the sale of securities beyond the Closing Date.

This analysis makes clear the plaintiffs' reason for combining allegations concerning the Direct RICO Claim with those concerning the Derivative RICO Claim together in the Eighth Count of the Second Amended Complaint. In order to create the appearance of criminal conduct existing over a substantial period of time, the plaintiffs allege that the pattern of racketeering activity included the Pre–Investment Conduct as well as the Post–Investment Conduct.

The Direct RICO Claim, however, relates to Pre–Investment Conduct. The injury to the plaintiffs occurred on or before the Closing Date. By contrast, the Post–Investment Conduct occurred subsequent to the Closing Date; its victim was SIG.

The Direct RICO Claim involves different a different enterprise, different objective, different injury, different victims and different conduct from the Derivative RICO Claim. The distinct injuries demonstrate the existence of distinct claims. Whereas the injury to the plaintiffs occurred on or before the Closing Date, the injury to SIG continued as long as the RICO Defendants used the corporation as a vehicle for self-dealing or profiteering. *Cf. Keystone Ins. Co.*, 863 F.2d at 1130 (civil RICO claim accrues at time plaintiff knew of the last injury or last predicate act which is part of the pattern of racketeering activity).

These distinct claims should not be combined in the hope of creating a pattern of racketeering activity where none exists.[22] To hold otherwise would in effect permit the plaintiffs to evade the statute of limitations on their federal securities claims by alleging the same facts and presenting the same evidence in support of the Direct RICO Claim.[23] The Pre–Investment Conduct and the Post–Investment Conduct share neither the relationship nor the conti-

---

**22.** In the context of criminal RICO, the government is not permitted to split a single RICO pattern into multiple counts for purposes of obtaining multiple convictions. *United States v. Ciancaglini*, 858 F.2d 923, 930 (3d Cir.1988). By analogy, civil plaintiffs should not be permitted to divide their claims in the hope of obtaining multiple judgments. In this case, however, it is not a single plaintiff attempting to divide a single RICO scheme, but two plaintiffs alleging patterns based upon different conduct.

**23.** According to the plaintiffs, the Units they purchased in the Private Offering are now virtually worthless. Second Amended Complaint,

¶ 59. The Direct RICO Claim seeks recovery of the entire amount of the investment in the Units. *See supra* note 9. This is the same recovery sought under the federal securities laws. A judgment on the Direct RICO Claim, therefore, would effectively permit the plaintiffs to recover for their time-barred securities fraud claims. Such a result is contrary not only to the Congressional intent in creating a relatively short statute of limitations for section 12(b) of the 1933 Act but also to the adoption of that limitations period for section 10(b) of the 1934 Act. *See In re Data Access*, 843 F.2d at 1549–50.

nuity necessary to establish the existence of a pattern of racketeering activity as to the Direct RICO Claim. Therefore, the Direct RICO Claim fails to state a claim and must be dismissed pursuant to Fed.R. Civ.P. 12(b)(6).

### 4. Derivative RICO Claim

■ As to the Derivative RICO Claim, the plaintiffs have adequately alleged the existence of a pattern of racketeering activity. As discussed previously, the Derivative RICO Claim is brought by the plaintiffs on behalf of the bankruptcy estate of SIG. The Derivative RICO Claim relates to the Post–Investment Conduct of the defendants. These claims involve acts of profiteering and self-dealing by the RICO Defendants through the enterprise of SIG. The Second Amended Complaint alleges acts which share sufficient continuity and relationship to establish the existence of a pattern of racketeering activity as to the Derivative RICO Claim.

■ The RICO Defendants argue the Post–Investment Conduct is not pleaded with particularity as required by Fed.R. Civ.P. 9(b). The requirements of Rule 9(b) for a RICO claim are construed liberally in the Third Circuit. *Christidis v. First Pennsylvania Mortg. Trust,* 717 F.2d 96, 100 (3d Cir.1983). Rule 9(b) must be harmonized with the flexibility permitted under Rule 8 of the Federal Rules of Civil Procedure. *Seville Indus. Machinery v. Southmost Machinery,* 742 F.2d 786, 792 (3d Cir.1984), *cert. denied,* 469 U.S. 1211, 105 S.Ct. 1179, 84 L.Ed.2d 327 (1985). That Rule requires a "short and plain statement" with each pleading being "simple, concise and direct." *Id.;* Fed.R.Civ.P. 8.

■ A complaint need not read like a laundry list of dates, times and persons involved in the underlying transaction. As the Third Circuit explained in *Seville:*

> Rule 9(b) requires plaintiffs to plead with particularity the "circumstances" of the alleged fraud in order to place the defendants on notice of the precise misconduct with which they are charged, and to safeguard defendants against spurious charges of immoral and fraudulent be-

havior. It is certainly true that allegations of "date, place or time" fulfill these functions, but nothing in the rule requires them. Plaintiffs are free to use alternative means of injecting precision and some measure of substantiation into their allegations of fraud.

742 F.2d at 791.

As long as the Second Amended Complaint sets forth enough information to provide factual support for plaintiffs' allegations, it meets the standard set forth in *Seville.* The Third Circuit, in analyzing a RICO claim, noted:

> The pleading requirement simply mandates that the actions establishing the fraud be pleaded with greater particularity than other pleadings; it has no impact on the definition of fraud itself. Thus, Rule 9(b) does not alter the substantive offense of fraud, but requires detailed allegations of that offense.

*Saporito v. Combustion Engineering, Inc.,* 843 F.2d 666, 675 (3d Cir.1988), *vacated on other grounds,* 489 U.S. 1049, 109 S.Ct. 1306, 103 L.Ed.2d 576 (1989). The Circuit held a pleading which disclosed only the general content of the representations at issue but not who made or received them failed to satisfy the particularity requirements of Rule 9(b). *Id.*

Many of the allegations of paragraphs 72–75 of the Second Amended Complaint appear to allege nothing more than mismanagement of SIG. For example, the alleged abuses by the directors of SIG include:

> the submission and payment of excessive travel and entertainment expenses by R. PRUPIS, N. PRUPIS and other senior officers and directors as well as by certain members of LLPP, at a time when SIG's true financial condition, as known by these defendants, was poor;

> the expenditure of over $250,000.00 on luxury automobiles for senior officers and directors of SIG, at a time when SIG's true financial condition, as known by these senior officers and directors, was poor.

Second Amended Complaint, ¶ 74(a)(iii) & (iv).

Another example of the unspecific nature of the allegations relating to Post–Investment Conduct is an allegation which does not appear to allege injury to SIG or any individual related to this lawsuit:

> the senior officers and directors conspired with an insurance agent to defraud the *agent's employer,* an insurance agency, by withholding approximately $150,000.00 of commissions, which monies were subsequently diverted by SIG directors and/or officers to a *new entity, established by the agent after he had passed an applicable state licensing exam.*

*Id.,* ¶ 74(a)(vi) (emphasis added).

 The allegations of the Second Amended Complaint, however, set forth with particularity certain conduct by the RICO Defendants which, taken as true, would allege racketeering activity injurious to SIG. For example, paragraph 74(c) alleges Bellezza, as chairman of the SIG underwriting committee, manipulated underwriting requirements to enable him to extort money from contractor clients of SIG for his personal benefit. The other members of the underwriting committee, namely N. Prupis, Paulus and Sparber, are alleged to have been aware of and acquiesced to Bellezza's activities, in effect aiding and abetting Bellezza without disclosing his activities to SIG shareholders. *Id.,* ¶ 74(c). Additionally, R. Prupis, N. Prupis, Bellezza, Paulus and Lipkind are alleged to have conspired or to have known of a conspiracy to falsify claims information to issue fraudulent financial statements in connection with the negotiation of a certain loan. *Id.,* ¶ 75(f).

Other claims are made against the LLPP firm, which is alleged to have used SIG as a "cash cow" to generate excessive fees. *Id.,* ¶ 53. Certain LLPP Defendants are alleged to have profiteered by forcing SIG to retain LLPP to render unnecessary legal services. *Id.,* ¶ 75(i). In addition, N. Prupis, Mezey, Sabato and Paulus, as members of the SIG audit committee, are alleged to have directed SIG to issue a mortgage loan

for the purchase of a home from R. Prupis in violation of Florida law. *Id.,* ¶ 74(a)(ii). Moreover, the allegations of the Second Amended Complaint as a whole support the inference that these activities threatened continued criminal conduct for as long as SIG was able to withstand the financial strain of such conduct.

The Second Amended Complaint also alleges SIG was harmed by the effects of these activities: "[SIG] was the victim insofar as monies were wrongfully diverted from SIG by the RICO Defendants, and insofar as it was the vehicle of wrongful activity conferring civil liability upon it." *Id.,* ¶ 114. Acts of self-dealing and manipulation of SIG to further the personal financial situation of the RICO Defendants are central to the allegations of the Second Amended Complaint.

The Post–Investment Conduct covers a duration of time and presents a threat of continuing harm sufficient to state a claim under RICO. These allegations are sufficiently particular to establish the existence of a pattern of racketeering activity and injury to SIG under RICO. Therefore, the motion to dismiss the Derivative RICO Claim is denied.

### 5. Rule 10(b)

The RICO Defendants argue the Eighth Count of the Second Amended Complaint should be dismissed pursuant to Fed.R. Civ.P. 10, which requires: "Each claim founded upon a separate transaction or occurrence ... shall be stated in a separate count ... whenever a separation facilitates the clear presentation of the matters set forth." *Id.* Dismissal under Rule 10(b) of the Direct RICO Claim is not an issue because that claim fails to state a cause of action pursuant to Rule 12(b)(6). The issue is whether the plaintiffs must be held to the requirements of Rule 10(b) as to the Derivative RICO Claim.

 To implicate the requirements of Rule 10(b), a complaint must meet three tests. C. Wright & A. Miller, 5 Federal Practice and Procedure: Civil § 1324 at 737 (West 2d ed. 1990). First, more than one claim must be asserted. *Id.* It is clear the

Eighth Count of the Second Amended Complaint contains two separate claims: the Direct RICO Claim seeks recovery of the investment of the plaintiffs in SIG; the Derivative RICO Claim seeks recovery for injury to SIG. Second Amended Complaint, ¶ 107.

Second, each claim must be based upon a separate transaction or occurrence. C. Wright & A. Miller, *supra*, at 741. This test is met because the Derivative RICO Claim is based upon the allegations of paragraphs 73 to 75 of the Second Amended Complaint, entitled "Facts Particularly Pertaining to the Post–Investment Derivative Claims." Second Amended Complaint, ¶¶ 73–75. By contrast, the Direct RICO Claim is brought "directly against SIG and the RICO Defendants regarding plaintiffs' *investment losses.*" *Id.*, ¶ 107 (emphasis added).

Finally, to satisfy Rule 10(b) a separate statement of a distinct claim arising out of a separate transaction or occurrence is necessary where it will facilitate a clear presentation of the issues. C. Wright & A. Miller, *supra*, at 745. As noted previously, the combination of the Direct and Derivative RICO Claims in the Eighth Count of the Complaint complicates an analysis of the issues. A careful reading of the Eighth Count reveals the plaintiffs have not alleged a pattern of racketeering activity as to the Direct RICO Claim. This conclusion, however, is obscured by the fact that the plaintiffs combined the allegations regarding racketeering activity for purposes of meeting the pattern requirement as to the Direct RICO Claim. Second Amended Complaint, ¶ 110.

■ Rule 10(b) requires that the plaintiffs amend the Second Amended Complaint to plead the Derivative RICO Claim in a separate count. The Eighth Count does not merely plead in the alternative or allege an alternate theory of recovery based upon the same transaction. The Direct and the Derivative RICO Claims are brought in two different capacities, seeking relief based on two different forms of injury and two different sets of factual allegations. This situation requires that leave be granted to permit the plaintiffs to amend the Second Amended Complaint to set forth the surviving, Derivative RICO Claim in a separate count.

At oral argument, the possibility of imposing sanctions upon the plaintiffs was raised and discussed at length. Counsel for DHS argued that if the Second Amended Complaint were dismissed for pleading insufficiency, the dismissal should be with prejudice because the Second Amended Complaint was filed one year ago, the moving briefs were served on counsel for the plaintiffs seven months ago and the plaintiffs did not file an amendment during that time period in an effort to correct pleading deficiencies. Tr. at 16–17.

■ Although the plaintiffs could have filed an amendment to the Second Amended Complaint to address the issues raised by the defendants, the failure to do so did not prejudice the defendants. The dismissal of Counts One through Four and the Direct RICO Claims would not have been altered by an amendment of the Second Amended Complaint, as required by Rule 12(b)(6). Similarly, the defendants were on notice of the Derivative RICO Claim in the Second Amended Complaint. The failure to comply with Rule 10(b) as to the RICO claims neither affects the substantive rights of the RICO Defendants nor violates Rule 12(b)(6).

The plaintiffs are ordered to file an amended pleading to "facilitate[ ] the clear presentation of the matters set forth." Fed.R.Civ.P. 10(b). This amendment is not to affect the substantive rights of the parties. It is not an opportunity to set forth additional factual allegations or to present a different or modified theory of recovery. The amendment is to employ the same terms as the Eighth Count of the Second Amended Complaint, but those terms are to be stated separately as to the Derivative RICO Claim in a separate count of the amended pleading.[24]

---

**24.** It is noted the Ninth Count of the Second Amended Complaint alleges a cause of action under the New Jersey RICO statute, N.J.S.A. 2C:41–1 *et seq.*, by pleading facts identical to

## C. *Pendent State Law Claims*

The remaining eleven counts of the Second Amended Complaint allege violations of various state statutes and common law causes of action. *See supra* note 8. These claims are supported by the principles of pendent jurisdiction. Second Amended Complaint, ¶ 4. In the seminal case of *United Mine Workers v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966), the Supreme Court stated:

> It has consistently been recognized that pendent jurisdiction is a doctrine of discretion, not of plaintiff's right. Its justification lies in considerations of judicial economy, convenience and fairness to litigants; if these are not present a federal court should hesitate to exercise jurisdiction over state claims, even though bound to apply state law to them.... Needless decisions of state law should be avoided both as a matter comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law. *Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well.*

*Id.* at 726, 86 S.Ct. at 1139 (emphasis added).

To the extent the pendent state claims in this case relate to Pre–Investment Conduct, they are dismissed along with the federal securities law claims and the Direct RICO Claim. Pendent jurisdiction exists over the state law claims based upon the Post–Investment Conduct of the RICO Defendants because those claims share a "common nucleus of operative fact" with the Derivative RICO Claim of the Eighth Count of the Complaint. *Id.*

those contained in Count Eight. The RICO Defendants did not move to dismiss Count Nine; however, they point out that arguments applicable to federal RICO may be applicable to the New Jersey RICO statute. *Kredietbank N.V. v. Joyce Morris, Inc.*, Civ. No. 84–1903, slip op. 1986 WL 5926 (D.N.J. 9 Jan. 1986), *aff'd mem.*, 808 F.2d 1516 (3d Cir.1986) (cited in Directors' Brief at 4 n. \*\*); *see, e.g., State v. Kuklinski*, 234 N.J.Super. 418, 491, 560 A.2d 1295 (L.Div.1988);

## Conclusion

For the foregoing reasons, summary judgment is granted on the federal securities law claims contained in the First through Fourth Counts of the Second Amended Complaint. The Direct RICO Claim in the Eighth Count and the state law claims which relate to the Pre–Investment Conduct of the plaintiffs are dismissed. The motions to dismiss the Derivative RICO Claim and state law claims pendent thereto are denied. Plaintiffs are directed to file an amended pleading as to the Derivative RICO Claim in accordance with the limitations discussed above.

*State v. Passante*, 225 N.J.Super. 439, 449, 542 A.2d 952 (L.Div.1987). Additionally, to the extent the claims under the New Jersey RICO statute are based on the Pre–Investment Conduct of the RICO Defendants, they are not supported by pendent jurisdiction. Therefore, the Rule 10(b) amendment should address both the Eighth and Ninth Counts of the Second Amended Complaint.